**United States District Court**
For the Northern District of California

1

2

3

4                    IN THE UNITED STATES DISTRICT COURT

5                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7    CENTER FOR FOOD SAFETY, et al.,   ) Case No. 11-1310-SC
                                        )
8                    Plaintiffs,        )
                                        ) ORDER REGARDING CROSS-
9            v.                         ) MOTIONS FOR SUMMARY JUDGMENT
                                        )
10                                      )
     THOMAS J. VILSACK; GREGORY         )
11   PARHAM,                            )
                                        )
12                   Defendants.        )
                                        )
13   _____

14   **I.**   **INTRODUCTION**

15        Plaintiffs Center for Food Safety, et al. ("Plaintiffs") bring

16   this action for violations of the National Environmental Policy Act

17   ("NEPA"), the Plant Protection Act ("PPA"), the Endangered Species

18   Act ("ESA"), and the Administrative Procedure Act ("APA") against

19   Defendant Thomas J. Vilsack, in his official capacity as Secretary

20   of the United States Department of Agriculture ("USDA"), and

21   Defendant Gregory Parham, in his official capacity as the

22   Administrator for the U.S. Department of Agriculture's Animal and

23   Plant Health Inspection Service ("APHIS") (collectively,

24   "Defendants").[1]   Now before the Court are cross-motions for summary

25   judgment filed by Defendants, Plaintiffs, and Intervenor

26

27   _____

28   [1] Parham was substituted for Cindy Smith as a defendant on May 24,
     2011.  ECF No. 43 ("Not. of Substitution").  Parham took over for
     Smith as Administrator of APHIS, effective April 29, 2011.  Id.

Defendants.[2]   ECF Nos. 103 ("Defs.' MSJ"), 104 ("Intervenor Defs.' MSJ"), 106 ("Pls.' MSJ").   These motions are fully briefed,[3] and the Court held a hearing on December 9, 2011.   For the reasons set forth below, the Court GRANTS Defendants and Intervenor Defendants' motions for summary judgment and DENIES Plaintiffs' motion for summary judgment.[4]

## II.   BACKGROUND

### A.   Roundup Ready Alfalfa

Plaintiffs challenge the decision of APHIS, an agency within the USDA, to deregulate genetically engineered alfalfa lines J101 and J1063, also known as Roundup Ready Alfalfa ("RRA").   Alfalfa is the fourth most widely grown crop in the nation, and the third most valuable.   Final Environmental Impact Statement ("FEIS") at 22-23.[5] It is a perennial crop typically grown three to six years or more in succession.   Id. at 22, 24.   Because of its dense growth, alfalfa is often grown without using herbicides; less than 17

---

[2] The Intervenor Defendants are Monsanto Company ("Monsanto"), Forage Genetics International, LLC ("Forage Genetics"), John Grover, Daniel Mederos, Dan Scheps, Carl Simmons, Mark Watte, California Alfalfa and Forage Association, Eureka Seeds, Gardena Alfalfa Seed Growers Association, and Midwest Forage Association. Intervenor Defs.' MSJ at 45.   On July 18, 2011, the Court issued an order stating that Intervenor Defendants could share a joint brief, subject to the Court's local rules regarding page limitations.   ECF No. 86.

[3] See ECF Nos. 158 ("Defs.' Opp'n"), 161 ("Intervenor Defs.' Opp'n"), 168 ("Pls.' Opp'n"), 174 ("Defs.' Reply") 175 ("Intervenor Defs.' Reply"), 176 ("Pls.' Reply").

[4] The Court also GRANTS the American Farm Bureau and Biotechnology Industry Organization's motion for leave to file a brief amici curiae.   See ECF No. 157 ("Amici Mot.").

[5] The FEIS can be found at Administrative Record ("AR") 3 12012-12275.

United States District Court
For the Northern District of California

percent of conventional growers use any herbicides.  Id. at 81, 146; ECF No. 42 ("Defs.' Answer") ¶ 101.

RRA is designed to withstand direct application of glyphosate, the active ingredient in herbicide formulations manufactured and sold by Monsanto by the commercial name Roundup.  See 70 Fed. Reg. 36917-19; AR 1 1555.  A farmer planting this genetically engineered form of alfalfa could spray glyphosate directly on or over crops to remove weeds without harming the alfalfa plants.  See FEIS at 3-4. Monsanto and Forage Genetics developed RRA to "increase alfalfa forage and seed purity through better control of most of the weeds that impact forage and seed production;" "enable alfalfa production on marginal lands with severe weed infestations;" and "provide growers with a weed-control system that has a reduced risk profile for the environment"; among other things.  Id. at 4.

Plaintiffs argue that deregulation of RRA poses significant risks to the environment.  First, deregulation will increase the use of glyphosate, which is toxic to various plant and animal species.  See FEIS at vi; Pls.' MSJ at 5.  Second, replacing conventional alfalfa with RRA may worsen the problem of glyphosate resistant weeds.  See FEIS at 132; Pls.' MSJ at 6.  When glyphosate is used year after year, weeds naturally resistant to glyphosate survive, and may then reproduce and flourish.  See FEIS at 131-35. Third, deregulation could result in increased gene flow from genetically engineered crops to conventional, organic, and wild plants.  See FEIS at 17; Pls.' MSJ at 6.  Plaintiffs contend that such transgenic contamination could result in the loss of natural varieties of alfalfa and hurt organic growers, whose customers

1  demand conventional and organic foods free of transgenic content.

2  Pls. MSJ at 7.

3        **B.**  **Initial Deregulation Determination**

4       The PPA gives the Secretary of the USDA the authority to adopt

5  regulations preventing the introduction and dissemination of plant

6  pests.  7 U.S.C. § 7711(a).  Pursuant to this authority, the USDA,

7  through APHIS, regulates "organisms and products altered or

8  produced through genetic engineering that are plant pests or are

9  believed to be plant pests."  7 C.F.R. § 340.0(a)(2) n.1.  Such

10  products and organisms are known as "regulated articles."  See id.

11  § 340.0.

12       APHIS originally considered RRA to be a regulated article.

13  See 70 Fed. Reg. 36917-36918.  Accordingly, it was unlawful for any

14  person to introduce RRA without first obtaining permission from

15  APHIS.  In April 2004, Monsanto and Forage Genetics submitted to

16  APHIS a request for determination of nonregulated status for RRA

17  pursuant to 7 C.F.R. § 340.6.  AR 1 1553-1958.  In 2005, after

18  considering hundreds of public comments and preparing an

19  Environmental Assessment, APHIS issued a Finding of No Significant

20  Impact and decided to deregulate RRA unconditionally, without

21  preparing an Environmental Impact Statement ("EIS").  70 Fed. Reg.

22  36917-36918.

23       Approximately eight months later, various plaintiffs,

24  including a number of the plaintiffs in the instant action, filed

25  suit in this district to challenge APHIS's Environmental

26  Assessment, Finding of No Significant Impact, and its decision to

27  deregulate RRA.  Geertson Seed Farms v. Johanns, No. 06-01075 CRB

28  ("Alfalfa I").  The court granted summary judgment in favor of the

4

**United States District Court**
For the Northern District of California

plaintiffs, finding that APHIS had violated NEPA because its Environmental Assessment was inadequate and its Finding of No Significant Impact was arbitrary and capricious.  Alfalfa I, 2007 U.S. Dist. LEXIS 14533, *37-38 (N.D. Cal. Feb. 13, 2007).  The Court found that APHIS's Environmental Assessment failed to answer "substantial questions" concerning the impacts of deregulation, including "whether [] the deregulation of RRA would lead to the transmission of the engineered gene to organic and conventional alfalfa" and "the possible extent of such transmission"; "farmers' ability to protect their crops from the genetically engineered gene"; and "the extent to which RRA will contribute to the development of Roundup-resistant weeds."  Id.  Through subsequent orders, the court (1) vacated APHIS's deregulation of RRA; (2) ordered APHIS to prepare an EIS before it made any decision on Monsanto's deregulation petition; and (3) enjoined the planting of any RRA in the United States after March 30, 2007.[6]  Alfalfa I, 2007 U.S. Dist. LEXIS 21491, at *8-9 (N.D. Cal. Mar. 12, 2007); Alfalfa I, 2007 U.S. Dist. LEXIS 32701, at *29 (N.D. Cal. May 3, 2007).

APHIS, Monsanto, and Forage Genetics appealed the Alfalfa I remedy.  The Ninth Circuit affirmed the decision of the district court, but the Supreme Court reversed and remanded.  Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743, 2761-62 (2010).  The Supreme Court held that the district court "abused its discretion in enjoining APHIS from effecting a partial deregulation [pending

---

[6] The Court also allowed those who had already purchased RRA to plant their seeds until March 30, 2007, and imposed certain conditions on the handling of already planted RRA.  Alfalfa I, 2007 U.S. Dist. LEXIS 32701, at *30; Alfalfa I, 2007 U.S. Dist. LEXIS 48383, at *6-12.

**United States District Court**
For the Northern District of California

1   APHIS's preparation of an EIS] and in prohibiting the possibility

2   of planting in accordance with the terms of such a deregulation."

3   Id. at 2761.   However, the Supreme Court left in place the district

4   court's vacatur of APHIS's deregulation decision.   Id. at 2756.

5   Subsequently, Forage Genetics petitioned APHIS for such a partial

6   deregulation while APHIS completed its EIS.   AR 3 4361.

7       C.   <u>Current Deregulation Determination</u>

8       In December 2009, APHIS published a draft EIS ("DEIS")

9   concerning the deregulation of RRA.   The DEIS analyzed only two

10   alternatives: (1) "no action," i.e., the regulated status of RRA

11   would remain unchanged; and (2) full deregulation.   DEIS (AR 2

12   13640-15115) at 11-14.   The DEIS dismissed partial deregulation

13   options, such as imposing isolation distances and geographic

14   restrictions to restrict transgenic contamination, because APHIS

15   concluded that it lacked the regulatory authority to enforce such

16   options.   Id. at 14-15.   Specifically, APHIS concluded that it had

17   no jurisdiction to regulate RRA once it determined that RRA did not

18   pose a plant pest risk.   See id. at 14.   During the 75-day comment

19   period, APHIS received approximately 244,000 public comments on the

20   DEIS.   FEIS at 9.

21       In December 2010, APHIS released its final EIS ("FEIS"), which

22   included a new, "co-preferred" alternative.   See FEIS at 13.   Under

23   the new alternative, APHIS would partially deregulate RRA through a

24   combination of isolation distances and geographic restrictions

25   intended to reduce the risks of transgenic contamination.   Id.   In

26   this alternative, a marketer of RRA would ensure that end users

27   implemented the required management practices through contracts,

28   licenses, or other means.   Id.

**United States District Court**
For the Northern District of California

In January 2011, APHIS issued a Record of Decision ("ROD"), fully deregulating RRA and allowing it to be grown without any restriction or oversight.  ROD (AR 4 988-1004) at 1.  APHIS stated that the full deregulation alternative was consistent with the regulatory requirements in 7 C.F.R. part 340 and that RRA "do[es] not pose a greater plant pest risk than other conventional alfalfa varieties."  Id. at 5.  APHIS acknowledged that full deregulation could lead to transgenic contamination through the transfer of pollen or seed mixing, increased use of glyphosate, and the evolution and proliferation of glyphosate-resistant weeds.  Id. at 8-10.  APHIS identified the no action alternative as the "environmentally preferred alternative," but decided against adopting it because "it d[id] not meet the agency's purpose and need . . . to make a decision that is consistent with its existing statutory authority and regulatory program" and because "APHIS has not identified any plant pest risks associated with [RRA]."  Id. at 15.  APHIS explained that it decided against partial deregulation because it had not identified any plant pest risks associated with RRA and, accordingly, "the restrictions in [the partial deregulation alternative] are not consistent with APHIS' regulatory authorities."  ROD at 14.

**D.  Plaintiffs' Lawsuit**

Plaintiffs filed the instant action in federal court on March 18, 2011 and filed their First Amended Complaint ("FAC") one month later.  ECF Nos. 1 ("Compl."); 13 ("FAC").  The FAC asserts five claims against Defendants.  See FAC ¶¶ 176-221.  The first three claims are for violations of NEPA and the APA, the fourth is for

**United States District Court**
For the Northern District of California

violations of the PPA and the APA, and the fifth is for violation
of the ESA.  Id.

    Plaintiffs' three NEPA claims assert, respectively, that (1)
APHIS failed to adequately consider the various environmental
consequences of its deregulation determination, (2) APHIS's NEPA
process was procedurally flawed and predetermined, and (3) a
supplemental EIS is required.  Id. ¶¶ 176-201.  Specifically,
Plaintiffs contend that the FEIS is flawed because it failed to
take a hard look at the environmental effects of deregulation on
transgenic contamination, conventional and organic growers,
glyphosate resistant weeds, the overall use of glyphosate, and the
availability of conventional alfalfa seed varieties (i.e., seed
concentration), among other things.  FAC ¶¶ 178-88.  Plaintiffs
also allege that APHIS improperly: limited its assessment to its
regulatory authority rather than its statutory authority; failed to
acknowledge its mandate to minimize noxious weed impacts;
predicated its scope and conclusions on its separate, previously
decided PPA "plant pest risk determination"; rejected the partial
deregulation alternative based on the erroneous conclusion that
APHIS does not have the authority to implement isolation distances
and geographic limitations; failed to account for the direct and
indirect impacts of increased glyphosate use; and relied on future
agency actions to mitigate the impacts of transgenic contamination.
See id. ¶¶ 189-198.  Finally, Plaintiffs allege that APHIS's
reliance on new agency policies concerning the coexistence of RRA
and conventional alfalfa requires a supplemental EIS to study the
efficacy of any such measures.  FAC ¶¶ 199-201.

**United States District Court**
For the Northern District of California

Plaintiffs' fourth claim for violations of the PPA and APA assert that APHIS's deregulation determination was arbitrary and capricious and not based on sound science. Plaintiffs allege that APHIS violated the PPA by failing to adequately consider: the effects of the glyphosate use that will result from deregulation; noxious weed risks; and transgenic contamination. Id. at 205-207. Plaintiff also challenges as arbitrary and capricious APHIS's conclusions that partial deregulation of RRA was inconsistent with APHIS's authority and mission, that RRA will not harm organic growers or various species beneficial to agriculture, and that RRA will not create a noxious weed risk. Id. ¶¶ 208-211.

Finally, Plaintiffs' fifth claim for violation of the ESA asserts that APHIS failed to insure, in consultation with the United States Fish and Wildlife Service ("FWS"), that deregulation of RRA would not harm protected species or critical habitat. Id. ¶ 215.

### III. <u>LEGAL STANDARD</u>

Entry of summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment should be granted if the evidence would require a directed verdict for the moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251 (1986). Thus, "Rule 56[] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>,

**United States District Court**
For the Northern District of California

1   477 U.S. 317, 322 (1986).  "The evidence of the nonmovant is to be
2   believed, and all justifiable inferences are to be drawn in his
3   favor."  Anderson, 477 U.S. at 255.  However, "[t]he mere existence
4   of a scintilla of evidence in support of the plaintiff's position
5   will be insufficient; there must be evidence on which the jury
6   could reasonably find for the plaintiff."  Id. at 252.

7        When the court reviews a government agency's final action, the
8   Rule 56 standard for summary judgment is amplified by 5 U.S.C. §
9   706(2) of the Administrative Procedure Act.  Title 5 U.S.C. § 706
10  provides the applicable standard of review for agency action.
11  Under § 706, "the reviewing court shall decide all relevant
12  questions of law, interpret constitutional and statutory
13  provisions, and determine the meaning or applicability of the terms
14  of an agency action."  Under § 706(2), the reviewing court shall
15  set aside agency action found to be "arbitrary, capricious, an
16  abuse of discretion, or otherwise not in accordance with law" or
17  "in excess of statutory jurisdiction, authority, or limitations, or
18  short of statutory right[.]"

19       "In making the foregoing determinations, the court shall
20  review the whole record or those parts of it cited by a party, and
21  due account shall be taken of the rule of prejudicial error."  5
22  U.S.C. § 706.  Summary judgment in a case of judicial review of
23  agency action requires the court to review the administrative
24  record to determine whether the agency's action was "arbitrary and
25  capricious, an abuse of discretion, not in accordance with law, or
26  unsupported by substantial evidence on the record taken as a
27  whole."  Environment Now! v. ESPY, 877 F. Supp. 1397, 1421 (E.D.

28

Cal. 1994) (citing <u>Good Samaritan Hospital, Corvallis v. Mathews</u>, 609 F.2d 949, 951 (9th Cir. 1979)).

"The court is not empowered to substitute its judgment for that of the agency." <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971), <u>overruled on other grounds by Califano v. Sanders</u>, 430 U.S. 99, 105 (1977).  The Ninth Circuit recognizes a narrow scope of review applicable to agency action: "Assuming that statutory procedures meet constitutional requirements, the court is limited to a determination of whether the agency substantially complied with its statutory and regulatory procedures, whether its factual determinations were supported by substantial evidence, and whether its action was arbitrary, capricious or an abuse of discretion." <u>Toohey v. Nitze</u>, 429 F.2d 1332, 1334 (9th Cir. 1970), <u>cert denied</u>, 400 U.S. 1022 (1971). Despite this narrow scope of review, the court is still expected to make a "thorough, probing, in-depth review" of the administrative record to ensure the validity of the agency action and "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." <u>Overton Park</u>, 401 U.S. at 415-16.

## IV.   <u>DISCUSSION</u>

### A.   <u>Plant Protection Act ("PPA")</u>

Congress enacted the PPA in 2000 to replace the former Plant Quarantine Act, the Federal Plant Pest Act, and the Federal Noxious Weed Act.  <u>See</u> Pub. L. No. 106-224, 114 Stat. 438 (codified at 42 U.S.C. § 7701 <u>et seq.</u>)  The PPA provides that APHIS may take certain actions "necessary to prevent . . . the dissemination of a

United States District Court
For the Northern District of California

plant pest or noxious weed within the United States."  7 U.S.C. § 7712(a).  Congress mandated that all of APHIS's decisions "shall be based on sound science."  Id. §§ 7701(4), 7711(b), 7712(b). APHIS's implementing regulations concerning transgenic plants, 7 C.F.R. Part 340, were promulgated pursuant to its previous, narrower Federal Plant Pest Act authority and therefore reference only plant pest harms, and not noxious weed harms.  See 52 Fed. Reg. 22,908; 58 Fed. Reg. 17,044; 62 Fed. Reg. 23,945.

Plaintiffs assert that APHIS violated the PPA because (1) APHIS failed to consider the noxious weed harms of deregulation; (2) APHIS's conclusion that it could not partially deregulate RRA was arbitrary and capricious; and (3) APHIS's plant pest determination was not based on sound science.  See Pls.' MSJ at 36-31 30; Pls.' Opp'n at 20-31; FAC ¶¶ 202-12.  For the reasons discussed below, the Court finds that the plant pest risk assessment made in connection with RRA was consistent with the PPA. Accordingly, the Court GRANTS Defendants and Intervenor Defendants' motions for summary judgment with respect to Plaintiffs' PPA claim.

### 1.   Noxious Weed Risk

Plaintiffs first argue that "APHIS completely failed to undertake its statutorily mandated obligation to investigate whether RRA poses noxious weed risks."  Pls.' MSJ at 25. Plaintiffs argue that, under the PPA's expansive noxious weed mandate, APHIS was required, to the extent practicable, to limit the resulting noxious weed impacts of deregulating RRA.  Id. at 28. Yet, "APHIS nowhere applied or even acknowledged its noxious weed authority in approving RRA."  Id. at 29.  Plaintiffs concede that 7 C.F.R. Part 340, the regulation under which APHIS exercised its

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

authority to deregulate RRA, does not require an analysis of noxious weed effects. Id. Plaintiffs also concede that the proposed amendments to Part 340 - which would incorporate noxious weed effects - have not been finalized. Id. However, Plaintiffs argue that APHIS was still required to analyze noxious weed effects pursuant to its express statutory mandate. Id. Plaintiffs contend RRA poses the types of noxious weed risks encompassed by the statute since it may foster the development of glyphosate resistant weeds and threaten organic growers through transgenic contamination. Id. at 28.

Defendants respond that Plaintiffs' noxious weeds argument is premised on a misunderstanding of the PPA's existing statutory and regulatory structure. Defs.' Opp'n at 2. Defendants argue that, in enacting the PPA, Congress maintained the distinction between the regulation of plant pests and noxious weeds and that APHIS's regulations reflect that distinction. Defs.' MSJ at 18. Defendants acknowledge that APHIS has issued a proposed rule that would amend the regulations so as to incorporate noxious weed effects into decisions on petitions to deregulate genetically engineered plants. Defs.' Opp'n at 3. However, Defendants insist that APHIS is bound to act in accordance with its current rules and regulations until they have been formally amended. Id. Intervenor Defendants argue that Plaintiffs' noxious weed argument is barred by their failure to exhaust administrative remedies as they have failed to petition APHIS to add RRA to the regulatory list of noxious weeds. Intervenor Defs.' MSJ at 44. Intervenor Defendants further argue that Plaintiffs cannot show that RRA is a noxious weed. Id. at 43.

United States District Court
For the Northern District of California

In enacting the PPA, Congress provided distinct mechanisms for regulating plant pests and noxious weeds.  Section 7711(a) of the codified Act prohibits the "unauthorized movement of plant pests" absent regulatory permission, while section 7712(f)(1) provides that "the Secretary may publish, by regulation, a list of noxious weeds that are prohibited or restricted from entering the United States or that are subject to restrictions on interstate movement[.]"  In accordance with this framework, APHIS exercises its statutory authority over plant pests and noxious weeds pursuant to two distinct regulations -- 7 C.F.R. Part 340 relates to plants pests and 7 C.F.R. Part 360 relates to noxious weeds.  APHIS's reasonable interpretation of its statutory mandate is entitled to deference.[7]  See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 865 (1984).

In light of the prevailing statutory and regulatory framework, the Court agrees with Defendants.  Prior to the decision challenged by Plaintiffs, RRA was a regulated article under the plant pest regulations in 7 C.F.R. Part 340.  APHIS was then presented with a petition for nonregulated status brought under 7 C.F.R. § 340.6, see AR 1 1553, and it acted accordingly.  APHIS's decision to deregulate RRA was based on its determination that RRA did not pose a plant pest risk and there is no indication that the agency strayed from the current regulations in Part 340 in reaching that

---

[7] Plaintiffs argue that APHIS's attempt to "ignore the PPA's noxious weed mandates" is not entitled to deference since it is merely a "convenient litigation position."  See Pls.' Opp'n at 23.  This argument is unpersuasive.  First, as evidenced by 7 C.F.R. Part 360, the agency has not ignored its noxious weed mandate.  Second, the distinct regulatory frameworks for noxious weed and plant pest risks were developed, through notice and comment rulemaking, long before the inception of the instant litigation.

14

United States District Court
For the Northern District of California

1    determination.   Plaintiffs do not dispute that RRA has never been

2    included on the regulatory list of noxious weeds promulgated

3    pursuant to Part 360.   Nor do Plaintiffs dispute that they have not

4    petitioned APHIS to include RRA on this list.[8]   Accordingly, the

5    Court finds that APHIS was under no obligation to assess whether

6    RRA posed a noxious weed risk when it made its deregulation

7    determination.

8                2.   Plant Pest Risk

9        Plaintiffs next argue that APHIS's determination that RRA does

10   not pose a plant pest risk was arbitrary and capricious and not

11   based on sound science.   Pls.' Opp'n at 25-32.   Plaintiffs

12   specifically point to four instances in which APHIS allegedly

13   ignored record evidence in reaching its plant pest risk

14   determination.   See id.

15       First, Plaintiffs argue that APHIS improperly ignored evidence

16   that RRA deregulation will harm "raw or processed commodities"

17   through transgenic contamination, i.e., cross-pollination with

18   organic and conventional alfalfa.   Id. at 25.   The Court disagrees.

19   Nothing in the PPA indicates that APHIS must account for the

20   effects of cross-pollination on other commercial crops in

21   conducting its plant pest risk assessment.   The PPA defines a plant

22   pest as a "protozoan," "nonhuman animal," "parasitic plant,"

23
24   [8] Plaintiffs contend they should not be required to file such a
     petition since "APHIS cannot outsource the agency's statutory
     duties to Plaintiffs."  Pls.' Opp'n at 24.   This argument is
25   unavailing.  Plaintiffs cite no authority which would have required
     APHIS to take up the issue of noxious weed risks in response to a
26   petition brought under 7 C.F.R. Part 340.   Notably, the statutory
     language on which Plaintiffs rely is permissive.   See 7 U.S.C.
27   7712(a) ("The Secretary may prohibit or restrict the importation .
     . . of any . . . noxious weed" (emphasis added)); id. § 7712(f)(1)
28   ("the Secretary may publish, by regulation, a list of noxious weeds
     that are prohibited" (emphasis added)).

**United States District Court**
For the Northern District of California

1   "bacterium," "fungus," "virus or viroid," or "infectious agent or

2   other pathogen."   7 U.S.C. § 7702(14).   None of these organisms are

3   pests because they might cross-pollinate with commercial crops.

4   Thus, there is no reason to believe that Congress intended for

5   APHIS to regulate commercial crops as plant pests because they pose

6   a risk of transgenic contamination.   APHIS's regulatory list of

7   plant pests is consistent with this interpretation.   See 7 C.F.R. §

8   340.2.   Additionally, APHIS did not ignore the potential economic

9   impacts on conventional and organic alfalfa growers.   These issues

10  were considered in the agency's NEPA analysis.   See FEIS at 38-70.

11  Accordingly, the Court finds that APHIS's plant pest risk

12  determination did not improperly ignore the risk of transgenic

13  contamination.

14       Second, Plaintiffs contend that APHIS failed to consider the

15  effect of deregulation on the development on glyphosate resistant

16  weeds.   See Pls.' Opp'n at 28.   Plaintiffs argue that deregulation

17  will result in increased use of herbicides by farmers which, in

18  turn, will enable herbicide resistant weeds to flourish.   See id.

19  Defendants respond that Plaintiffs misinterpret the scope of

20  APHIS's plant pest risk assessment by focusing on the consequences

21  of the use of pesticide by third parties rather than the plant pest

22  risk directly posed by RRA.   See Defs.' Opp'n at 10.   The Court

23  agrees with Defendants and finds that APHIS's interpretation of its

24  plant pest mandate is consistent with the PPA and its implementing

25  regulations.   APHIS's task in performing its plant pest risk

26  assessment was to determine whether RRA itself posed a plant pest

27  risk because of its genetic modifications.   See 7 U.S.C. § 7702(14)

28  (defining plant pest as "any living stage" or an enumerated list of

16

United States District Court
For the Northern District of California

1  organisms "that can directly or indirectly injure, cause damage to,

2  or cause disease in any plant or plant product.")  Nothing in the

3  PPA suggests that APHIS was required to consider the effects of

4  increased herbicide use or the development of herbicide resistant

5  weeds in making this assessment.  <u>See</u> <u>id.</u>  Nor do APHIS's plant

6  pest regulations require such an analysis.  <u>See</u> 7 C.F.R. Part 340.

7  Third, Plaintiffs argue that APHIS improperly ignored evidence

8  that deregulation will increase the risk of plant disease.  Pls.'

9  Opp'n at 31.  APHIS had concluded that RRA, "whether sprayed with

10  glyphosate or not, w[as] found to be similarly affected by typical

11  plant diseases found in alfalfa, and do[es] not harbor an altered

12  pest or pathogen community compared to other alfalfa varieties."

13  AR 3 11816-17.  Plaintiffs argue that APHIS reached this conclusion

14  by improperly relying on Monsanto's "anecdotal, unscientific

15  'observations,'" and ignored other studies reaching contrary

16  conclusions.  Pls.' Opp'n at 32.  Plaintiffs contend that the

17  administrative record shows that glyphosate treated Roundup Ready

18  crops harbor elevated levels of soil pathogens in their root

19  tissues and that such pathogens increase the severity of crop

20  disease.  <u>Id.</u>  Plaintiffs' argument is unpersuasive since, as

21  discussed above, the PPA requires APHIS to consider the plant pest

22  risks posed by a regulated article -- in this case, RRA -- not

23  herbicides which may be used in conjunction with that regulated

24  article.  Further, in its NEPA analysis, APHIS considered a number

25  of studies not addressed by Plaintiffs; these found no direct

26  evidence that glyphosate use is linked to the development of plant

27  disease.  <u>See</u>, <u>e.g.</u>, AR 3 11360-61.  Courts "grant considerable

28  discretion to agencies on matters 'requir[ing] a high level of

**United States District Court**
For the Northern District of California

technical expertise.'" Ecology Ctr. v. Castaneda, 574 F.3d 652, 658 (9th Cir. 2009) (quoting Marsh v. Or. Natural Res. Council, 490 U.S. 360, 377 (1989)). "[I]t is not our role to weigh competing scientific analyses." Id. at 659. Accordingly, based on the conflicting studies in the administrative record, the Court cannot conclude that APHIS's conclusions concerning plant disease lacked a basis in sound science.

Fourth, Plaintiffs contend APHIS ignored evidence that RRA deregulation will increase the "weediness" of feral alfalfa. Pls.' Opp'n at 26-28. Specifically, Plaintiffs argue that RRA will cross-pollinate with feral alfalfa and that the resulting feral RRA will become a problem weed which farmers will be unable to eradicate through the application of glyphosate. Id. at 27. Plaintiffs' argument fails for several reasons. First, the administrative record shows that APHIS's plant pest risk assessment addressed the potential weed risks posed by RRA. See AR 3 11807-15. After considering a number of technical studies involving field trials and growth experiments, the agency concluded that "no unusual characteristics were noted that would suggest increased weediness of [RRA] plant populations." AR 3 11815. Second, Plaintiffs' argument ignores the fact that APHIS considered and discussed alternative methods to control RRA in feral stands, including the application of non-glyphosate herbicides. See AR 3 11808. Third, as discussed above, there is no indication that Congress intended APHIS to regulate genetically engineered crops as plant pests based on their potential to interbreed with other crops.

1    For these reasons, the Court cannot conclude that APHIS's

2   plant pest risk assessment was arbitrary and capricious or lacked a

3   basis in sound science.

4            3.   Partial Deregulation

5    Plaintiffs also challenge as arbitrary and capricious APHIS's

6   conclusion that it could not partially regulate RRA under the PPA

7   once it determined that RRA was not a plant pest.  See Pls.' MSJ at

8   30.  In the ROD, APHIS had rejected the partial deregulation

9   alternative because it was "not consistent with APHIS's regulatory

10   authorities."  ROD at 14.  Plaintiffs argue that APHIS's final

11   decision was based on the false assumption that its authority was

12   so limited that it had to ignore the impacts of glyphosate

13   resistant weeds and transgenic contamination.  See Pls.' MSJ at 31.

14   Plaintiffs further argue that APHIS's contention that it could not

15   partially deregulate RRA is inconsistent with its own prior

16   positions as well as judicial precedent.  See id. at 33.

17    Defendants do not dispute that APHIS's decision against

18   partial deregulation was predicated on its finding that RRA did not

19   pose a plant pest risk.  Defendants also agree that, under the PPA,

20   APHIS may regulate a genetically engineered plant in part.  Defs.

21   Opp'n at 5.  However, Defendants contend that partial regulation

22   must be based on either (1) an acknowledged plant pest risk or (2)

23   the continued presumption of such a risk in the absence of APHIS's

24   scientific finding to the contrary.  Id. at 7.  Defendants submit

25   that, in the instant action, neither element is present since APHIS

26   determined that RRA did not present a plant pest risk.  Id.

27    The Court agrees with Defendants.  APHIS's conclusion that it

28   could not continue to regulate RRA once it determined that the crop

did not pose a plant pest risk is entitled to deference as it is consistent with the current statutory and regulatory framework. See Chevron, 467 U.S. at 865. Under both the PPA and agency regulations, APHIS's authority to regulate organisms such as RRA is predicated upon the existence of a plant pest risk. The PPA provides, in relevant part, that APHIS may regulate any plant or plant product if it determines that regulation is necessary to prevent the dissemination of a plant pest. See 7 U.S.C. § 7712. APHIS's regulations also define a "regulated article" according to plant pest risk. See 7 C.F.R. § 340.1. As explained in section IV.A.2 supra, the Court declines to second-guess APHIS's determination that RRA does not pose a plant pest risk.

The Court also rejects Plaintiffs' contention that APHIS's deregulation decision is somehow inconsistent with the agency's prior determinations. Plaintiffs point to APHIS's decision to partially deregulate Roundup Ready sugar beets. But that determination was made in response to a request for partial deregulation, not full deregulation, and APHIS's assessment of the request did not reach the issue of whether the crops would pose a plant pest risk if they were fully deregulated. See Sugar Beets Interim PPRA at 1.[9] In contrast, in the instant action, Plaintiffs are challenging APHIS's final determination that RRA does not pose a plant pest risk.

The judicial precedent relied on by Plaintiffs is also inapposite. In Monsanto, the Supreme Court addressed the different regulatory alternatives available to APHIS pending or following the

_____

[9] Available at http://www.aphis.usda.gov/brs/aphisdocs/03_32301 p_ppra.pdf.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

completion of an EIS, including partial deregulation.  <u>See</u> 130 S.

Ct. at 2759.  Similarly, the district court in <u>Alfalfa I</u> discussed

the possibility of including a partial deregulation alternative in

APHIS's EIS, stating that "further collection of data can inform

APHIS as to the likely extent of any gene transmission and the

realistic measures, if any, that may be taken to prevent or at

least reduce such contamination."  2007 U.S. Dist. LEXIS 14533, at

*18.  However, neither court directly addressed APHIS's authority

to partially regulate RRA under the PPA.  Nor did either court

suggest that APHIS could continue to regulate RRA after the agency

had determined that the crop did not pose a plant pest risk.

     For these reasons, the Court finds that APHIS's RRA

deregulation determination did not violate the PPA.

**B.    Endangered Species Act ("ESA")**

     Section 7(a)(2) of the ESA requires each federal agency to

"insure that any action, authorized, funded, or carried out by

[the] agency . . . is not likely to jeopardize the continued

existence of any endangered species or threatened species or result

in the destruction or adverse modification of habitat of such

species[.]"  16 U.S.C. § 1536(a)(2).  To this end, Section 7(b)

requires an action agency to consult with FWS if it finds that a

federal action may affect a listed species or critical habitat.

<u>Id.</u> § 1536(b); 50 C.F.R. § 402.14(a).  If the action agency

determines that its action "may affect" critical species or

habitat, then formal consultation is mandated.  <u>Nat'l Res. Def.</u>

<u>Counsel v. Houston</u>, 146 F.3d 1118, 1126 (9th Cir. 1998).

     Plaintiffs argue that APHIS violated the ESA by failing to

consult with FWS to determine the effect of RRA deregulation on

21

threatened and endangered plants and animals and their habitats. Pls.' MSJ at 11-12.  APHIS declined to consult with FWS because it concluded that the RRA gene product would have "no effect" on federal listed threatened or endangered species or on critical habitat.  See ROD at 11.  Plaintiffs argue that Defendants' finding of "no effect" improperly focused on the RRA gene product and unlawfully ignored the glyphosate use that will inevitably accompany the planting of the glyphosate resistant crop.  Pls.' MSJ at 11-12.  Plaintiffs suggest that the increased use of glyphosate resulting from deregulation will jeopardize a number of threatened and endangered species listed under the ESA.  See id. at 13. Plaintiffs point out that, under Wild Fish Conservancy v. Salazar, 628 F.3d 513, 525 (9th Cir. 2010), the agency must consider indirect effects on threatened and endangered species when making a finding of "no effect."  Id. at 12.

Defendants respond that APHIS was not required to consult on the effects of glyphosate use because APHIS does not authorize or regulate herbicide use and, as such, RRA deregulation is not the legally relevant cause of any effects of such use on listed species.  Defs.' MSJ at 31.  Defendants point out that Congress tasked EPA, not APHIS, with regulating herbicide use through the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA").  Id. at 32.  In 2004 and 2005, pursuant to FIFRA, EPA authorized glyphosate for use on RRA.  See AR 2 429-31; AR 2 438-40.  Relying in part on the Supreme Court's decisions in Department of Transportation v. Public Citizen, 541 U.S. 752 (2004), and National Association of Home Builders v. Defenders of Wildlife, 551 U.S. 644 (2007), Defendants argue that a defendant agency must be the "legal

22

**United States District Court**
For the Northern District of California

cause" of the allegedly harmful effects in order for the agency to be required to consult under Section 7 of the ESA. Id. at 32-33. Defendants reason that APHIS's deregulation determination is not the legally relevant cause of harms stemming from glyphosate use since EPA, not APHIS, regulates glyphosate.[10] Id.

Plaintiffs argue that APHIS should not be allowed to ignore its duties under the ESA by passing the buck to EPA. They contend that "Plaintiffs are not challenging EPA's registration of glyphosate, but APHIS's decision to allow unrestricted use of a cropping system specifically designed to be dependent on glyphosate use." Pls.' MSJ at 22. Plaintiffs also challenge APHIS's conclusion that adherence to EPA guidelines will ensure that the glyphosate used in conjunction with RRA will not adversely affect threatened or endangered species. Id. at 23. Plaintiffs point to EPA's comments on the FEIS, stating that APHIS had "erroneously assum[ed]" that EPA had determined that glyphosate "poses no unreasonable environmental risk to federally listed threatened and endangered species." Id. (quoting AR 4 670). Plaintiffs also argue that EPA has yet to assess the effects of glyphosate on species found near the acreage on which glyphosate has or will be used.[11] Id. at 24.

---

[10] APHIS made a similar argument in Alfalfa I, asserting that the agency need not have considered glyphosate use in its NEPA analysis since "there are other federal agencies, primarily [EPA], that are responsible for regulating herbicides[.]" 2007 U.S. Dist. LEXIS 14533, at *32. The district court declined to rule on the issue because it had already determined that APHIS's NEPA analysis must consider the cumulative impact of increased glyphosate use with respect to the development of glyphosate resistant weeds. Id.

[11] EPA has stated that it "intends to conduct a national-level Endangered Species Assessment as part of its registration review for glyphosate." AR 4 670. Registration review began in 2009 and a final registration review decision is expected in 2015. Id.

United States District Court
For the Northern District of California

As the administrative record shows that RRA itself will have no effect on listed species, see FEIS 238-42, Plaintiffs' ESA claim ultimately turns on whether APHIS's actions are the legally relevant cause of increased glyphosate use.  The Supreme Court recently addressed the issue of legally relevant causation in Public Citizen.  In that case, the Supreme Court held that the Federal Motor Carrier Safety Administration ("FMCSA") did not need to consider the environmental effects of cross-border operations of Mexican-domiciled trucks in its NEPA Environmental Assessment because it lacked the discretion to prevent those operations. Public Citizen, 541 U.S. at 770.  The court explained that "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect." Id.  "[T]he legally relevant cause of the entry of the Mexican trucks [was] not FMCSA's action, but instead the actions of the President in lifting the moratorium [on their entry] and those of Congress in granting the President this authority while simultaneously limiting FMCSA's discretion." Id. at 769.  The Court found that FMSCA did not have the discretion to countermand the decisions of the President or Congress.  Id.  The court explained:

> [By statute,] FMSCA must grant registration to all domestic or foreign motor carriers that are "willing and able to comply with" the applicable safety fitness and financial responsibility requirements. [Citation] FMCSA has no statutory authority to impose or enforce emissions controls or to establish environmental requirements unrelated to motor carrier safety.

United States District Court
For the Northern District of California

Id. at 758-759.  The court found that a "'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA."  Id. at 767.

In Homebuilders, the Supreme Court found that the principle enunciated in Public Citizen -- "that an agency cannot be considered the legal 'cause' of an action that it has no statutory discretion not to take" -- also applied in the context of section 7 of the ESA.  551 U.S. at 667.  In that case, the plaintiffs challenged EPA's decision to transfer Clean Water Act ("CWA") permitting authority to a state without first insuring that the transfer would not jeopardize endangered or threatened species. Id. at 649.  The Supreme Court stated that an agency's duties under section 7(a)(2) of the ESA only applied to discretionary action. Id. at 669.  The court found that EPA had no discretion in Homebuilders because the CWA required transfer of permitting authority as certain triggering criteria had been met.  Id.

In the instant action, APHIS is not the legally relevant cause of the glyphosate use complained of by Plaintiffs.  Under the PPA, APHIS may only regulate a genetically engineered crop such as RRA where the crop presents plant pest or noxious weed risk.  See Section IV.A supra.  Once APHIS determined that RRA did not pose a plant pest risk, it lacked further discretionary authority to regulate the crop and thus could not be obligated to conduct additional ESA analysis.  APHIS has no authority to regulate where and how glyphosate is used.  Congress has delegated that authority to EPA through FIFRA and, pursuant to that authority, EPA has

**United States District Court**
For the Northern District of California

registered glyphosate for use on RRA.[12]   The Court must "draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not."   Public Citizen, 541 U.S. at 767 (internal quotations and citations omitted). Accordingly, the Court cannot hold APHIS responsible for herbicide use regulated by EPA.[13, 14]

If Plaintiffs allegations are true, then it is disturbing that EPA has yet to assess the effects of glyphosate on most of the species found near the acreage on which RRA will be planted and glyphosate will be used.   See Pls.' MSJ at 23-24.   The administrative record indicates that EPA will not complete a national-level Endangered Species Assessment with respect to RRA glyphosate use until 2015.   See AR 4 670.   However, the Court is in no position to evaluate EPA's compliance with the relevant environmental laws.   EPA is not a party to this action and its administrative record is not before the Court.

---

[12] Further, EPA must comply with the consultation requirements of the ESA when it registers herbicides and pesticides under FIFRA. See Wash. Toxics Coalition v. Envtl. Prot. Agency, 413 F.3d 1024, 1032 (9th Cir. 2005).

[13] Despite APHIS's position that its deregulation determination is not the legally relevant cause of third-party glyphosate use, the agency's FEIS addresses the impact of glyphosate on the development of weeds.   See Section IV.C.4 infra.   The Court declines to address whether NEPA required APHIS to undertake this analysis.

[14] Plaintiffs filed three extra-record declarations in support of their ESA claims.   ECF Nos. 107 ("Cox Decl."), 108 ("Kegley Decl."), 109 ("Relyea Decl."). These declarations concern the risks posed to threatened and endangered species by glyphosate use. Defendants and Intervenor Defendants move to strike these declarations on the grounds that the Court's review should be limited to the administrative record.   ECF Nos. 167 ("Intervenor Defs.' MTS"), 170 ("Defs.' MTS").   As the Court finds that APHIS's deregulation determination is not the legally relevant cause of increased glyphosate use, Plaintiff's extra-record declarations are irrelevant to the Court's ESA analysis.   Accordingly, Defendants and Intervenor Defendants' motions to strike are DENIED as moot.

United States District Court
For the Northern District of California

1    For these reasons, the Court GRANTS Defendants and Intervenor

2    Defendants' motions for summary judgment with respect to

3    Plaintiff's ESA claim.

4        C.   **National Environmental Policy Act ("NEPA")**

5        With respect to Plaintiffs' NEPA claims, the Court must

6    determine whether APHIS's "decision was based on a consideration of

7    the relevant factors, or whether its actions were arbitrary,

8    capricious, an abuse of discretion or otherwise not in accordance

9    with the law." Blue Mountains Biodiversity Project v. Blackwood,

10   161 F.3d 1208, 1211 (9th Cir. 2011) (internal quotation marks and

11   citation omitted).  "In short, [the Court] must ensure that the

12   agency has taken a 'hard look' at the environmental consequences of

13   its proposed action."  Id.  "A hard look includes considering all

14   foreseeable direct and indirect impacts.'"  Earth Island Inst. v.

15   U.S. Forest Serv., 442 F.3d 1147, 1159 (9th Cir. 2006) (internal

16   quotation marks and citation omitted), overruled on other grounds

17   by Winter v. Nat'l Res. Def. Council, Inc., 555 U.S. 7, 21 (2008).

18       Plaintiffs argue that APHIS violated NEPA by (1) manipulating

19   the scope of its EIS and ROD and its analysis of alternatives to

20   favor full deregulation of RRA, (2) failing to adequately analyze

21   the effectiveness of mitigation measures that APHIS claimed would

22   lessen the adverse impacts associated with deregulation, (3)

23   relying on data and analysis supplied by Monsanto, (4) failing to

24   adequately analyze the risks posed by glyphosate resistant weeds,

25   and (5) relying on unsupported assumptions in its contamination

26   assessment.[15]  Pls.' MSJ at 35-40; Pls.' Opp'n at 34-36, 38.  The

27

28   [15] Plaintiffs appear to have abandoned their third claim that
     APHIS's reliance on new agency policies on "coexistence" was
     arbitrary and capricious.  See FAC ¶ 201.

**United States District Court**
For the Northern District of California

1    Court disagrees and finds that APHIS took the hard look required by

2    NEPA.   Accordingly, the Court GRANTS Defendants and Intervenor

3    Defendants' motions for summary judgment with respect to

4    Plaintiff's NEPA claims.

5                    1.   <u>Alternatives Analysis</u>

6         Plaintiffs argue that APHIS's failure to acknowledge its

7    authority under the PPA to prevent noxious weed harms and to

8    partially deregulate RRA, discussed in Section IV.A <u>supra</u>, also led

9    APHIS to conduct a fundamentally flawed NEPA alternatives analysis.

10   <u>See</u> Pls.' MSJ at 35.   Plaintiffs assert that, based on APHIS's

11   erroneous view of its statutory authority, the agency established

12   an overly restrictive purpose and need statement in its EIS and

13   then improperly rejected the partial deregulation alternative.   <u>Id.</u>

14   at 34-38.   APHIS did discuss partial deregulation in its FEIS.

15   However, Plaintiffs contend that this analysis was "superfluous and

16   illusory" since, in the ROD, APHIS ultimately determined that it

17   lacked the authority to adopt such an option.   <u>Id.</u> at 37.

18   Plaintiffs state that they "are not challenging an exercise of

19   APHIS's discretion to select an alternative that Plaintiffs might

20   not prefer, but rather APHIS's erroneous failure to acknowledge and

21   exercise its discretion at all."   <u>Id.</u>

22        NEPA regulations provide that an EIS "shall briefly specify

23   the underlying purpose and need to which the agency is responding

24   in proposing the alternatives including the proposed action."   40

25   C.F.R. § 1502.13.   Courts evaluate a statement of purpose under a

26   reasonableness standard.   <u>Westlands Water Dist. v. U.S. Dep't of</u>

27   <u>Interior</u>, 376 F.3d 853, 866 (9th Cir. 2004).   In doing so, the

28   Ninth Circuit "has afforded agencies considerable discretion to

**United States District Court**
For the Northern District of California

define the purpose and need of a project." <u>Friends of Se.'s Future</u>
<u>v. Morrison</u>, 153 F.3d 1059, 1066 (9th Cir. 1998).  "[T]he statutory
objectives of the project serve as a guide by which to determine
the reasonableness of objectives outlined in an EIS." <u>Westlands</u>
<u>Water Dist.</u>, 376 F.3d at 866.  An agency may not "slip past the
strictures of NEPA" by "contriv[ing] a purpose so slender as to
define competing 'reasonable alternatives' out of consideration
(and even out of existence)." <u>Simmons v. U.S. Army Corps of</u>
<u>Eng'rs</u>, 120 F.3d 664, 666 (7th Cir. 1997).

The Court finds that Plaintiffs' arguments concerning APHIS's
alternatives analysis fail for the same reasons as their PPA
claims.  As discussed in Section IV.A <u>supra</u>, APHIS's interpretation
of its plant pest and noxious weed authority in this context is
consistent with the PPA and, thus, entitled to deference.
Accordingly, the Court cannot find that APHIS's purpose and need
statement is overly restrictive or that APHIS's decision to reject
the partial deregulation alternative was arbitrary and capricious.

## 2.   Analysis of Mitigation Measures

Plaintiffs also argue that APHIS's NEPA analysis failed to
adequately consider the effectiveness of the mitigation measures
proposed to reduce the environmental impacts of deregulation.
Pls.' MSJ at 40.  Plaintiffs complain that, because APHIS retained
no oversight authority whatsoever, not one of the mitigation
measures proposed in the EIS is legally mandated.  <u>Id.</u> at 41.
Instead, the measures are premised on best management practices,
joint agreements among members of alfalfa grower trade
associations, or contractual arrangements between growers and
suppliers of seed.  <u>Id.</u>  Plaintiffs contend that these mitigation

United States District Court
For the Northern District of California

measures are unlikely to work since private actors have little

incentive or ability to enforce them.  See id. at 41-43.

Plaintiffs specifically criticize mitigation strategies intended to

address the risks of transgenic contamination and the development

of glyphosate resistant weeds.  Id.

Plaintiffs' arguments are unpersuasive.  "[I]t would be

inconsistent with NEPA's reliance on procedural mechanisms . . . to

demand the presence of a fully developed plan that will mitigate

environmental harm before an agency can act." Robertson v. Methow

Valley Citizens Council, 490 U.S. 332, 353 (1989).  A mitigation

plan "need not be legally enforceable, funded or even in final form

to comply with NEPA's procedural requirements." National Parks &

Conservation Ass'n v. U.S. Dep't of Transp., 222 F.3d 677, 681 (9th

Cir. 2000).  The Court "need only be satisfied that the agency

took the requisite "hard look" at the possible mitigating

measures[.]" Okanogan Highlands Alliance v. Williams, 236 F.3d

468, 473 (9th Cir. 2000).  Here, APHIS's FEIS discussed the

effectiveness of various mitigation strategies, including those

intended to reduce the risk of transgenic contamination and

glyphosate resistant weeds.  See, e.g., FEIS 111, 115, 164, 205-07;

AR 3 11774-80; AR 3 10680-89.  This analysis meets NEPA's hard-look

requirements.  The Court declines to vacate APHIS's deregulation

determination merely because stronger mitigation measures might

have been available.

3.   Monsanto's Contributions to the FEIS

Plaintiffs argue that the FEIS was flawed because "APHIS

simply cut and pasted Monsanto's reports into the FEIS's

appendices, passing them off as agency work product." Pls. Opp'n

**United States District Court**
For the Northern District of California

at 36.   Plaintiffs contend this practice violated APHIS's duty to

independently evaluate the information submitted.   Id.   This

argument lacks merit.   NEPA regulations provide that a federal

agency may use information submitted by a third party in its FEIS,

"either directly or by reference," so long as that information is

independently evaluated and the names of the persons responsible

for the independent evaluation are included in the list of

preparers.   40 C.F.R. § 1506.5(a).   The purpose of the regulation

is that "acceptable work not be redone."   Id.   In the instant

action, there is no indication that APHIS failed to independently

evaluate the material submitted by Monsanto.   Further, the list of

preparers of the FEIS identifies the APHIS employees responsible

for review and acceptance of the material included in the FEIS,

including the appendices.   See AR 3 9624.

> 4.   Glyphosate Resistant Weeds

Plaintiffs contend that APHIS's discussion of glyphosate

resistant weeds was fundamentally flawed for a variety of reasons.

These arguments are undercut by the administrative record.

Plaintiffs first complain that the agency "undertook no

analysis of the overall acreage that will be in continual

[glyphosate-tolerant] crop rotation with RRA, such as corn[,] . . .

or how the RRA deregulation will affect resistant weed development

in these rotations."   Pls.' Opp'n at 39 (internal quotations

omitted).   However, as Plaintiffs concede, the ROD acknowledged

that RRA introduction will "increase the number of acres in a

continual [glyphosate tolerant] crop rotation" and thereby could

"contribute to the development of these [glyphosate-resistant]

weeds in agricultural systems."   ROD at 15.   The FEIS also

discussed the possibility that deregulation could lead to the development of glyphosate resistant weeds.  See, e.g., FEIS 127-129, 217-20, 222-23.  APHIS found that the development of such weeds depended on a number of factors and that, "[c]urrently, there are no concrete data, information, or models that provide a prescriptive determination on if or how many weed species may evolve resistance to glyphosate[.]"  Id. at 129.  The agency was "not aware of any models that simulate the evolution of weeds resistant to glyphosate in a [glyphosate tolerant] alfalfa production system."  Id.  In light of limited data and models available, APHIS was not required to estimate the amount overall acreage in continual glyphosate-tolerant crop rotation.  "NEPA requires not that an agency engage in the most exhaustive environmental analysis theoretically possible, but that it take a 'hard look' at relevant factors."  Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv., 460 F.3d 1125, 1139 (9th Cir. 2006).

Next, Plaintiffs argue that APHIS minimized the problem of glyphosate resistant weeds by stating that they infest only two million acres when the agency knew the figure was five times higher and by omitting discussion of factors that make RRA more likely to foster such weeds.  Pls.' Opp'n at 39-40.  This argument is unavailing.  The FEIS reports figures from several studies with different estimates of the total number of crop acres infested by glyphosate resistant weeds.  See, e.g., FEIS at 34 (2 million acres); AR 3 10684 (7 million acres).  Plaintiffs offer no reason why one report is more accurate than the others.  Further, as APHIS included a variety of figures on this topic in the FEIS, including one indicating that 38 million acres could be infested by 2013, AR

United States District Court
For the Northern District of California

3 10684, there is no indication that the agency was trying to minimize the risk. Additionally, contrary to Plaintiffs' assertion, the FEIS does include a discussion of why RRA is likely to foster glyphosate resistant weeds. See AR 3 10678-689.

Plaintiffs also claim that APHIS failed to assess the cumulative impacts of the increase in non-glyphosate herbicide, which will be used to control glyphosate resistant weeds. Pls.' Opp'n at 40-41. This argument is contradicted by the FEIS, which acknowledges that deregulation could result in increased use of non-glyphosate herbicides and assesses the cumulative impacts of such a development. See, e.g., FEIS at 152-55, 179-85, 187-88, 222-23, 231-32. Plaintiffs complain that APHIS failed to assess the cumulative impacts associated with particular projections for herbicide use. Pls. Opp'n at 40-41. However, the absence of such an exhaustive analysis does not render the FEIS "so incomplete or misleading that the decision maker and the public could not make an informed comparison of the alternatives." Animal Def. Council v. Hodel, 840 F.2d 1432, 1439 (9th Cir. 1988).

Finally, Plaintiffs argue that APHIS violated NEPA by failing to address EPA's comments concerning herbicide resistant weeds. Pls.' Opp'n at 41. This argument lacks merit. NEPA regulations provide that "[t]he agency shall discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised." 40 C.F.R. § 1502.9. EPA's comments on the DEIS concerning herbicide resistant weeds primarily sought to clarify terms. See AR 4 666-68. EPA later commented that it was dissatisfied with the FEIS because the

**United States District Court**
For the Northern District of California

1    language on which it had previously commented remained "confusing,"

2    and suggested further clarifying language.  Id.  There is no

3    indication that EPA disagreed with APHIS's ultimate conclusion or

4    that EPA's suggestions for clarification represented an "opposing

5    view."  Further, APHIS stated that it took EPA's comments into

6    consideration before making its decision.  ROD at 5.

7        Accordingly, the Court finds that APHIS's analysis of

8    glyphosate resistant weeds satisfied NEPA's hard look requirements.

9    None of the purported deficiencies raised by Plaintiffs in this

10   area, considered independently or holistically, provide sufficient

11   grounds to set aside APHIS's deregulation determination.

12           5.   Transgenic Contamination

13       Finally, Plaintiffs contend that APHIS's discussion of

14   transgenic contamination relies on unsupported assumptions that are

15   contrary to the record.  Pls.' Opp'n at 42.  Specifically,

16   Plaintiffs contend that APHIS failed to assess evidence of

17   contamination resulting from the limited acreage of RRA planted

18   prior to deregulation, including 2008 and 2009 contamination

19   reports by alfalfa seed producer Cal/West.  Id.

20       The Court finds that APHIS took the required hard look at the

21   risk of transgenic contamination.  As Plaintiffs concede, APHIS did

22   in fact mention evidence of the contamination experienced by

23   Cal/West.  Id.  Plaintiffs complain that APHIS failed to "assess"

24   this evidence, but it is unclear what more Plaintiffs would have

25   APHIS do.  The agency discussed the likelihood of gene transfer

26   between alfalfa varieties, the potential socioeconomic impacts of

27   deregulation on conventional alfalfa farmers, and ultimately

28   concluded that contamination was possible but unlikely.  See, e.g.,

United States District Court
For the Northern District of California

1   FEIS 25-28, 109-26, App. I (AR 3 10816), App. V (AR 3 11684).

2   Accordingly, the FEIS "contains a reasonably thorough discussion of

3   the significant aspects of the probable environmental consequences"

4   of deregulation, including the potential for transgenic

5   contamination.  See Kern v. U.S. Bureau of Land Mgmt., 284 F.3d

6   1062, 1071 (9th Cir. 2002).

7

8   **V.**   **CONCLUSION**

9        For the foregoing reasons, the Court GRANTS the motions for

10  summary judgment filed by Defendants Thomas Vilsack and Gregory

11  Parham and by Intervenor Defendants and DENIES the motion for

12  summary judgment filed by Plaintiffs Center for Food Safety, et al.

13  The Court declines to vacate the deregulation of Roundup Ready

14  alfalfa.

15

16       IT IS SO ORDERED, ADJUDGED, and DECREED.

17

18       Dated: January 5, 2012

19                                          UNITED STATES DISTRICT JUDGE

20

21

22

23

24

25

26

27

28

35